<pre>
 1               IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TENNESSEE
 2                   AT KNOXVILLE, TENNESSEE
   _____
 3                                 )
   UNITED STATES OF AMERICA,       )
 4                                 )
            Government,            )
 5                                 )
   vs.                             ) Case No. 3:19-cr-144
 6                                 )
   PRESTON ANDREW WATSON,          )
 7                                 )
            Defendant.             )
 8 _____)
</pre>

<pre>
 9                    SENTENCING PROCEEDINGS
           BEFORE THE HONORABLE KATHERINE A. CRYTZER
10
                    Friday, May 28, 2021
11                  1:54 p.m. to 3:54 p.m.
</pre>

**APPEARANCES:**

<pre>
13          **ON BEHALF OF THE GOVERNMENT:**

14          JENNIFER KOLMAN, ESQ.
            U.S. DEPARTMENT OF JUSTICE
15          OFFICE OF U.S. ATTORNEY
            800 Market Street
16          Suite 211
            Knoxville, TN 37902
17

18          **ON BEHALF OF THE DEFENDANT:**

19          BENJAMIN GERALD SHARP, ESQ.
            FEDERAL DEFENDER SERVICES OF EASTERN
20          TENNESSEE, INC. (KNOX)
            800 South Gay Street
21          Suite 2400
            Knoxville, TN 37929
22
</pre>

**REPORTED BY:**

<pre>
23
   Teresa S. Grandchamp, RMR, CRR
24 P.O. Box 1362
   Knoxville, Tennessee 37901
25 (865) 244-0454
</pre>

1                          <u>INDEX</u>

2                         <u>EXHIBITS</u>

3  <u>FOR THE GOVERNMENT</u>:

4     <u>EXHIBIT</u>                              <u>ID</u>:    <u>IN EVID</u>:

5     Exhibit No. 3                           24        47
       Exhibit No. 13                          27        29
6      Exhibit No. 4                           29        49
       Exhibit No. 6-A                         30        50
7      Exhibit No. 6                           30        49
       Exhibit No. 11                          35        52
8      Exhibit No. 3-A                         25        47
       Exhibit No. 3-B                         47        47
9      Exhibit No. 9                           31        51
       Exhibit No. 12                          38        53
10                     *  *  *  *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       THE COURTROOM DEPUTY:  Please remain seated and

2  come to order.

3       This is Criminal Action 3:19-cr-144-1, United

4  States of America versus Preston Andrew Watson.

5       Is the government present and ready to proceed?

6       MS. KOLMAN:  It is, Your Honor.

7       THE COURTROOM DEPUTY:  Is the defendant present

8  and ready to proceed?

9       MR. SHARP:  Yes, Your Honor.  Good afternoon.

01:54PM  10       THE COURT:  Good afternoon.

11       Will the courtroom deputy please swear the

12  defendant.

13       THE COURTROOM DEPUTY:  Yes, Your Honor.

14       (The defendant was thereupon duly sworn.)

15       THE COURTROOM DEPUTY:  Please be seated.

16       THE COURT:  In advance of today's hearing, the

17  Court has received and reviewed a number of documents;

18  the Indictment, Plea Agreement, the Report and

19  Recommendation related to Mr. Watson's guilty plea, and

01:54PM  20  the order adopting the Report and Recommendation, the

21  Agreed Preliminary Order of Forfeiture, and the Notice

22  of Forfeiture, the Presentence Report and Addendum to

23  the Presentence Report, and a second addendum to the

24  Presentence Report, which references a victim impact

25  statement that was made available to the parties and to

the Court, a Notice of Objection to the Presentence
Report from Mr. Watson, a Notice of No Objections to the
Presentence Report from the United States, and a
response to Mr. Watson's PSR objections made by the
United States.

The Court has also considered the United
States' sentencing memorandum, the defendant's
sentencing memorandum and motion for downward variance
and exhibits to that sentencing memoranda from friends
and family of Mr. Watson expressing their support.

The Court has also received and reviewed a
notice of witness testifying at the sentencing hearing
from the United States and an addendum to the United
States' sentencing memorandum.

Does either party have additional material to
offer that the Court has not already listed?

Ms. Kolman?

MS. KOLMAN:  The only thing, Your Honor, which
I think has been filed, is the stipulation with regards
to restitution for the BluePillow series for the $3,000.

THE COURT:  Thank you, Ms. Kolman.  The Court
has received that stipulation.  I don't believe it's
been filed on the docket yet, but the Court has received
the hard copy.

Mr. Sharp, anything further?

1              MR. SHARP:  Nothing further, Your Honor.

2              THE COURT:  Mr. Sharp, have you and Mr. Watson

3      read the Presentence Report documents, including the

4      Presentence Report and addenda?

5              MR. SHARP:  We have, Your Honor.

6              THE COURT:  Have you had the opportunity to

7      discuss the same in full with Mr. Watson?

8              MR. SHARP:  I have, Your Honor.

9              THE COURT:  Sir, you are Preston Andrew Watson;

01:56PM 10      is that correct?

11              THE DEFENDANT:  Yes, ma'am.

12              THE COURT:  You are represented here by

13      Mr. Sharp; is that correct?

14              THE DEFENDANT:  Yes, ma'am.

15              THE COURT:  Mr. Watson, you were charged in a

16      seven-count indictment.  Count One charges you with

17      production of child pornography in violation of 18

18      United States Code §§ 2251(a) and 2251(e).

19              Further, Count Three charges you with

01:57PM 20      distribution of child pornography in violation of 18

21      United States Code § 2252A(a)(2).

22              On July 13th of 2020, you pled guilty to Counts

23      One and Three of that indictment.

24              Do you understand that Count One carries a

25      maximum term of imprisonment of 15 years -- I'm sorry --

a minimum term of imprisonment of 15 years and a maximum
term of imprisonment of 30 years, a term of supervised
release of at least five years up to life, and a fine of
$250,000, along with a $100 special assessment?

THE DEFENDANT:  I do understand, Your Honor.

THE COURT:  Do you understand that Count Three
carries a minimum term of five years' imprisonment and a
maximum term of 20 years, a term of supervised release
of at least three years up to life, a fine of up to
$250,000, and a $100 special assessment?

THE DEFENDANT:  I do, Your Honor.

THE COURT:  Mr. Watson, have you received and
had the opportunity to read and discuss the Presentence
Report and addendum with Mr. Sharp?

THE DEFENDANT:  Yes, I have.

THE COURT:  Do you understand the Presentence
Report and related sentencing documents in this case?

THE DEFENDANT:  I do.

THE COURT:  Has Mr. Sharp answered any
questions that you may have regarding those documents
and your sentencing hearing here today?

THE DEFENDANT:  Yes, he has.

THE COURT:  I'd like to talk with the parties
briefly about the procedure for today's hearing.  First,
the Court will hear the parties on any remaining

1    objections to the Presentence Report.

2            Second, the Court will calculate the advisory

3    guidelines range that is applicable to Mr. Watson.

4            Third, the Court will decide whether to accept

5    the provisions of the plea agreement that the parties

6    have entered in this case.

7            Fourth, the Court will hear the parties on the

8    motions for a departure under the sentencing guidelines

9    themselves.

01:58PM  10            Fifth, the Court will hear arguments on

11    application of the § 3553(a) factors, any requests for a

12    variance, and any other sentencing recommendations.

13            And, finally, the Court will hear any final

14    statements, including hearing from the defendant, if he

15    would like, and then pronounce the sentence.

16            Ms. Kolman, have you received the Presentence

17    Report and addenda in this case?

18            MS. KOLMAN:  I have, Your Honor.

19            THE COURT:  Does the government have any

01:59PM  20    objections to the Presentence Report?

21            MS. KOLMAN:  I do not, Your Honor.

22            THE COURT:  Mr. Sharp, the defendant has filed

23    objections to the Presentence Report.  Would he like to

24    address those objections now?

25            MR. SHARP:  Yes, Your Honor.  And I apologize

1   for the late notice to the Court and to the parties.  We

2   would be moving to withdraw those objections at this

3   point.  This case has been a bit unusual in the scoring

4   of the guidelines; however, after further review and

5   investigation, we feel it's appropriate to withdraw

6   those objections.

7                   THE COURT:  Thank you, Mr. Sharp.

8                   Ms. Kolman, in the government's response to

9   defendant's objections to the Presentence Report, the

02:00PM 10  government states that it anticipates moving during the

11  sentencing hearing for the third-level reduction for

12  acceptance of responsibility pursuant to Guideline

13  §3E1.1(b).  Would the government like to do so now?

14                  MS. KOLMAN:  Yes, Your Honor, we would ask that

15  that be applied.

16                  THE COURT:  Okay.  Mr. Sharp, I presume that

17  Mr. Watson has no objection to that motion.

18                  MR. SHARP:  No objection, Your Honor.

19                  THE COURT:  Okay.  The Court grants the motion

02:00PM 20  and also notes that the recommended Presentence Report

21  calculation as revised anticipated that Mr. Watson would

22  be given the full three-point credit.  The Court adopts

23  the revised Presentence Report as its own findings in

24  this matter.

25                  Given these findings and calculations, the

Court calculates the following advisory guidelines

range:  Mr. Watson's total offense level is 43.  His

criminal history category is II.  This results in a

guideline imprisonment range of life, which the United

States Sentencing Commission has defined as 470 months,

a supervised release range of five years to life for

Count One and five years to life for Count Three, a fine

range of $50,000 to $250,000, and a special assessment

of $200.

02:01PM          Are there any objections for the record?

Ms. Kolman?

MS. KOLMAN:  No, Your Honor.

THE COURT:  Mr. Sharp?

MR. SHARP:  No, Your Honor.

THE COURT:  The parties have entered a plea

agreement in this case.  Pursuant to the plea agreement,

does the United States wish to move the Court to dismiss

the remaining counts against Mr. Watson in the

indictment?  By my count, that is Counts Two, Four,

02:01PM Five, Six, and Seven.

MS. KOLMAN:  That is correct, Your Honor.

THE COURT:  Okay.  Ms. Kolman, does the

government so move?

MS. KOLMAN:  Yes, please.

THE COURT:  Do the parties have any objection

1  to the Court accepting the provisions of the plea

2  agreement in full?

3          Mr. Sharp?

4          MR. SHARP:  No objection, Your Honor.

5          THE COURT:  Ms. Kolman, I presume no objection.

6          MS. KOLMAN:  That's correct, Your Honor.

7          THE COURT:  Okay.  The Court accepts the

8  provisions of the plea agreement and dismisses the

9  remaining counts of the indictment as to Mr. Watson.

02:02PM  10  Those are Counts Two, Four, Five, Six, and Seven.

11          Now that it has properly calculated the

12  advisory guidelines range, the Court will consider any

13  departures under the guidelines.

14          Ms. Kolman, does the government wish to make a

15  motion for a departure under the guidelines?

16          MS. KOLMAN:  No, Your Honor.

17          THE COURT:  Mr. Sharp?

18          MR. SHARP:  No departure motion, Your Honor.

19          THE COURT:  Having properly calculated the

02:02PM  20  advisory guidelines range and considering any motions

21  for departure, the Court must consider the factors set

22  forth in 18 United States Code § 3553(a) to ensure that

23  the Court imposes a sentence that is sufficient, but not

24  greater than necessary, to comply with the purposes of

25  sentencing.

                    In addition to the guidelines and policy

statements, the Court must consider the nature and

circumstances of the offense, the history and

characteristics of Mr. Watson, the need for the sentence

imposed to reflect the seriousness of the offense, to

promote respect for the law, and to provide just

punishment for the offense, to afford adequate

deterrence to criminal conduct, to protect the public

from further crimes of the defendant, and to provide

Mr. Watson with needed educational or vocational

training, medical care, or other correctional treatment.

                    The Court also considers the kinds of sentences

available, the need to avoid unwarranted sentencing

disparities among similarly-situated defendants, and the

need to provide restitution to any victims of the

offenses.

                    Does either party wish to make an argument

about the application of the factors set forth in

3553(a), request a variance, or otherwise make a

sentencing recommendation?

                    Mr. Sharp, the Court has read your motion for a

variance and would like for you to start first.

                    MR. SHARP:  Thank you, Your Honor.

                    Your Honor, may I remove my mask?

                    THE COURT:  Yes, please.  As we're bringing

folks back into the courtroom post the CDC's most

updated guidance, if a party can safely remove his or

her mask, you may do so. Mr. Sharp, you may also make

presentation from the podium if that's most efficient.

MR. SHARP: Thank you, Your Honor.

Your Honor, I will attempt to not be too

repetitive of the filed sentencing memorandum and motion

for variance that I filed. There are a few things,

though, that I would like to highlight in regard to

02:04PM Mr. Watson and the representation I've had of him for

quite some time now. He has been here in local custody

for a while, a lot of that due to the pandemic. This

case would have been resolved sooner.

I think it's -- you really can't underscore the

level and extent of Mr. Watson's mental health concerns

in this case, and the conduct in and of itself -- and I

don't want anything to be misconstrued. The conduct --

he recognizes how bad the conduct is, and the regret

that he has and the remorse that he has for the pain

02:05PM he's caused these individuals is sincere, and nothing

that I argue here today is in the way of an excuse but

more in the way of reasons. And I recognize that's a

fine line, Your Honor.

But when you look at the history of Mr. Watson,

from a very young age, while he was at Bible school, he

1  was sexually abused at five years old, and that

2  certainly put him in a situation where he was a sexual

3  abuse victim and in the situation where someone of that

4  age, not being able to understand or to filter what is

5  going on, what's happening to him, and the addition of a

6  place where he thought he was safe and was told, "Don't

7  tell anyone that" -- "You can't tell anyone about this."

8         So from a very young age, he has these very

9  conflicting messages and understandings of safety, of

02:06PM  10  sexuality, things that a five-year-old should not have

11  to deal with.

12         And he lives with this secret well into his

13  teens until he finally discloses it to family members

14  well after the fact that anything could be done, as far

15  as prosecution of the individual.  But it was something

16  that he had lived with and he had focused all his

17  attentions in being perfect from that time forward.

18         And I think I put that in the memo, but when

19  you speak to his family in particular, he always wanted

02:06PM  20  to be the best student, the best athlete, the best son,

21  the best brother, and knowing that he fell short on some

22  of that.  So a lot of these issues that he has dealt

23  with come from a place of -- a certain level of

24  insecurities that he had grown with, and even though he

25  has had these successes, he still had this underlying

insecurity.

When he was in treatment, when he started to get counseling, when he started to understand the situation that he was in and started to understand and realize the level of mental illness that he was suffering from and he started getting diagnosed with bipolar disease and -- I think it was attention deficit disorder, and he had obsessive-compulsive tendencies as well, when he was treated, when he had healthcare, he was going to therapy and he was being medicated, during those periods of time is when he saw the best ability. And certainly any type of medication for mental health is a moving target, but he at least had periods of stability while he was being treated.

So a couple of things happened after he was kind of in this treatment regime. One, the biggest being his father passed away in 2012, and from everybody that I've interviewed in his family, they said that that was a marked difference for Mr. Watson, being his father was the one person that was his rock; that was the person that he always went to, and he became very withdrawn during that period of time after his father passed.

The second thing, and probably just as important, is: He lost his health insurance benefits.

So he falls completely out of treatment. He falls
completely out of medication, to a point where he
actually is homeless for a period of time. And during
this period of time, he's living in his car. And even
his family isn't aware of some of this at this point.
But they find out. He moves back in with his mother and
suffers these high and low swings that you see very
often in bipolar individuals.

It was during these times when he would get
very low that -- in conversations with his mother, he
would go into his room and he would stay in his room for
weeks and not come out, not even to use the restroom.
She would take the food to him and he would stay in his
room for weeks on end. And it was during these times
that the only thing he had was himself and his computer,
and those were the times where he would reach out to
these individuals and participate in these horrific acts
that's brought him here before the Court.

THE COURT: Mr. Sharp --

MR. SHARP: He understands that none of these
individuals --

THE COURT: Mr. Sharp, may I ask you just a
quick question with respect to timing there?

MR. SHARP: Yes, please.

THE COURT: When did these week periods of time

1  by himself begin?

2          MR. SHARP:  They would have started shortly

3  after he -- and I know the government has referenced the

4  charge that he had in state court.  It would have been

5  shortly after that period of time.  He was no longer

6  employed at the cellphone store, and it was during the

7  period of time that he had no medical benefits.

8          And once the family learned that there were

9  nights he was staying in his car, that's when he went

02:09PM 10  and moved back in with his mother.  So it would have

11  been probably around 2016, '17.  I apologize, Your

12  Honor.  I don't have the exact timeline.  It would have

13  been right in that ballpark.  So it would have been

14  after the state charges, though.

15          So, when you talk to Preston about these

16  charges -- and he fully understands that none of these

17  girls deserved any of this.  They didn't ask for it.

18  He, you know, reached out to them.  They started these

19  conversations and, you know, relationships.  Even in

02:10PM 20  Preston's state, he thought that they were some type of

21  actual relationship.  But he also understands how

22  manipulating and improper that they were and that none

23  of them deserve that.

24          And his sincere hope is that they can deal with

25  the trauma of having to go through this.  And he also

1   understands that being -- there are huge trust issues,

2   obviously, but, for whatever it's worth, he has assured

3   me that none of these images were ever shared at any

4   point with anyone; that he understands he made these

5   horrible threats that that is exactly what was going to

6   happen, but that at no time were any of these images

7   shared.  He also understands that they may not believe

8   that and respects why they would not, but it was

9   important that that be mentioned that none of them were

02:11PM  10   shared.

11   But when you consider the -- just the level

12   of -- kind of -- I don't want to say darkness, but he

13   would get into these obsessive-compulsive periods of

14   time where he was also in these depressive periods of

15   time, and it just kind of created a perfect storm in

16   regard to the way that he reacted to them.  And he would

17   become obsessed with getting a response from people, and

18   when he wouldn't get the response that he wanted or

19   needed, then he would become more and more aggressive

02:11PM  20   with his messaging.  And he recognizes how disruptive

21   that could be to somebody, particularly a teenage girl.

22   So he's not naive to the fact of the damage

23   that he's done at this point, and he wasn't in a place

24   where he would have done that typically under periods of

25   time where he is in treatment and he is medicated.

1    These were during periods where he was not.

2          So, that is, again, Your Honor, in the way of

3    reasons, not excuses.  And I hope that it's coming

4    across that way.  I don't intend to try to come up here

5    and put out all these excuses for why this occurred.

6          So when -- that's the part of the perfect storm

7    for him with where he was mentally, where he was with

8    his treatment or not with his treatment, more

9    importantly.

02:12PM  10          And then there is another aspect, a legal

11    aspect, from looking at the advisory guideline range of

12    kind of a perfect storm of scoring in the advisory

13    guideline range.

14          And I want to take a moment to thank AUSA

15    Kolman for her supplement sentencing memorandum.

16    Everybody entered into this plea agreement in good

17    faith.  I have no doubt about that.  We thought we had

18    the numbers.  We consulted with probation before we

19    entered into the plea agreement, and I believe probation

02:13PM  20    actually had to go to D.C. to score this one.

21          So in the 20 years that I've done this and the

22    last ten strictly in federal, I've never missed a

23    sentencing guideline the way that I missed this

24    sentencing guideline.

25          In reviewing that information, as noted in the

1    supplement, the report had not come back.  So we didn't

2    have those images.  We didn't have those things that we

3    could have factored into the guideline range on the

4    front end, and everybody thought when we entered into

5    this that we were in that 15- to 20-year range, which

6    would be very typical for this type of case.

7              And I'll get into that in just a second as

8    well, Your Honor, but it really was kind of the perfect

9    storm of scoring that took a case where we all thought

02:13PM   10    we were at 15 to 20 and put it into life, which, as the

11    Court is aware, is an equivalent of 470 months.

12              I would offer to the Court that that type of

13    sentence in this type of case would lead to a sentence

14    disparity; particularly in this district, but I would

15    argue generally as well.

16              Just as a point, I had a case along with

17    Ms. Kolman and this same investigative unit, ICAC, with

18    almost an identical fact scenario.  An individual was

19    friending teenagers, teenage girls.  He was requesting

02:14PM   20    photos.  They were sending photos.  Same similar

21    charges.  That individual was sentenced to 20 years and

22    two months, and --

23              THE COURT:  Mr. Sharp, in that case, was there

24    this expanded relevant conduct that we have in this

25    case?

1              MR. SHARP:  That's what changes this one,

2    right.

3              So the thing that I would say about the

4    relevant conduct -- and it's obviously bad; right?  Any

5    time that you're collecting this type of child

6    pornography and they come in these huge download

7    files -- and the numbers are really -- unfortunately the

8    numbers are not unusual for what we see, you know, and

9    that speaks to a whole different issue that I won't get

02:15PM 10   into, Your Honor, but it's not uncommon to see similar

11   fact scenarios with child pornography numbers in this

12   court.

13             I would point to the fact, though, that even

14   the PSR, it notes that those had not been accessed, I

15   think, since 2016.  Even though they were on that hard

16   drive, that specific hard drive itself had not been

17   accessed.  So while it's relevant conduct, and I don't

18   disagree that it's relevant conduct under the

19   guidelines, there was a time period where it had not

02:15PM 20   been accessed.  And it wasn't being accessed during this

21   period of time that he was reaching out to these other

22   individuals online.  So I would ask the Court to take

23   that into consideration as well.

24             But at no point when we entered into the plea

25   agreement on this matter did anybody think that we were

looking at these types of numbers. And I don't believe
that this is a number that adequately reflects what
would be appropriate under 3553 as far as a sentence
that is reasonable, but not greater than necessary,
under the facts.

As horrible as these offenses are, and they
are -- I don't pretend that they're not -- they are
hands-off offenses. There was never an attempt to meet
them. There was never a situation where he traveled or
attempted to travel. He never tried to get anybody to
travel to him.

I don't try to diminish the potential harm to
the victim. That's not what I'm doing. But when we see
cases, and particularly on the state level, when there
is hands-on offenses, we don't see these types of
numbers in state court. So that's only the point that
I'm making in regard to it being a hands-off offense,
not to minimize the harm to the victim, Your Honor.

So those would be my biggest concerns about
where this number is and where we would typically see a
number in this type of case when it is in regard to
sentencing disparities under 3553, and I would ask the
Court to take that into consideration.

And I would ask the Court to consider giving
him a variance more in line with the parties' intentions

when we entered into this plea agreement in the ballpark
of the 15- to 20-year range.

         And I would say -- I know I become numb doing
this.  As far as these numbers go, they are significant
numbers.  15 years is a significant amount of time.  The
law itself makes sure that there is going to be a
significant punishment no matter what occurs.

         I would just ask the Court to give Mr. Watson
a -- as much of a variance as the Court can take in good
conscience based on his conduct, where he was at the
time, with the understanding that he does understand
that mental health is going to be a part of his future.
And he would ask for that while he's in the BOP.  He
would ask for that as part of his supervised release
conditions as well.

         And the fact that he does have sincere remorse
for his conduct, Your Honor -- I know he's going to
address that during his allocution, but he understands
that what happened was unacceptable and is a situation
where he is dedicated to not be back in a situation like
this again.

         Thank you, Your Honor.

         THE COURT:  Thank you, Mr. Sharp.

         Ms. Kolman, I know that you've provided notice
of the intent to use a witness.  You may do so if you

would like, or I'm happy to hear from you in response, and then you could make that determination.

MS. KOLMAN: All right. Your Honor, I think because this case is unusual and it keeps going so, I was prepared to put my agent up. But I think because there is no disagreement to the PSR and we are looking at a life sentence, what I will do is present to you under the 3553 factors with regard to nature, circumstances and seriousness of this case, and I'll just do it myself; unless defense objects, and then at that point I can put my agent up.

I would just like to start by saying that I do agree with the defense with regards to the guidelines, which is why we did the addendum. However, I will say to the Court that in doing this for many years, we do know that there are people that specifically do that for a living with the sentencing guidelines. And it was also clear to all of us that statutorily, he could be looking at 50 years if the two cases were to run maximums on top of one another consecutively.

As far as looking at the other cases that have come into this Court that we all have worked on, specifically myself and the defense, there are different -- there are different circumstances, and I think they're very important for this Court to

understand, and that's what I'm planning on presenting

today because the government does feel that this case

was outside of the heartland of a lot of the cases that

we see.

And the first thing that I want to talk about

is the fact that with the other cases that Mr. Sharp

spoke to you about, with those cases, you had one or two

victims. In this case, Your Honor, as the Court knows,

that what the PSR indicated to you is that we had four

02:20PM  known victims.

Now, these kind of cases, these sextorsion

cases, the issue is that while we have known victims,

we're lucky we got those because those victims, as you

saw from the PSR, they came forward. They actually came

forward to and knew about NCMEC to make a report.

What I'm going to show you right now, Your

Honor, is -- if I could pull up my Government's

Exhibit 3.

(Government's Exhibit 3 was marked for

02:20PM  identification.)

MS. KOLMAN: When we started -- when the ICAC

unit started looking after the search warrant and

looking into the computers, what they found -- this is

just one page that I'm going to go down through.

If we could go to the next page, 3-A.

1             (Government's Exhibit 3-A was marked for

2              identification.)

3             MS. KOLMAN:  This is a folder structure that

4    continues downward, Your Honor.

5             And if we could go to the next page.

6             And this was -- we had just taken three pages.

7    I'm going to tell you, there were a lot more.  And what

8    you will see, Your Honor, is:  If you can look at each

9    of those, we went into each one of those.  Those are

02:21PM  10    each different victims.  And what the numbers

11    symbolize -- say with Ginger Bitch -- and excuse my

12    language.  I'll just say that now.  What you see there

13    is 46.  Those are 46 images of that girl.

14             Now, what the -- what my officer/agent would

15    have told you is that on these, because they are not

16    known victims -- and by that, what we mean is:  We don't

17    know what their names are; we don't necessarily know

18    where they live; nor do we know how old they are.  And

19    so when you put these things together as an ICAC

02:22PM  20    investigator, you have what's called -- they have a way

21    that they do the counting to make that determination,

22    and a lot of times, yes, it is a guess.  And they are

23    very conservative about that.  If there is any question,

24    they do not consider it.

25             So, I will tell you that in this situation,

1    there are a few like that.  However --

2              THE COURT:  Ms. Kolman, may I ask just a

3    foundational question?

4              MS. KOLMAN:  Sure.

5              THE COURT:  This is from Mr. Watson's laptop --

6              MS. KOLMAN:  This is from -- yes, one of his --

7              THE COURT:  -- not the hard drive?

8              MS. KOLMAN:  I'm sorry.  This is from the

9    desktop.

02:22PM 10              THE COURT:  Desktop.

11              MS. KOLMAN:  Yes, that was found when we did

12   the search warrant.

13              And I'm going to go ahead and just tender this

14   Government's Exhibit 3.

15              THE COURT:  Please.

16              MS. KOLMAN:  So what you see here are -- these

17   are, of course -- I'm not going to call them all victims

18   because we're not for sure because we have not been able

19   to identify them.  And what you -- what we do know is:

02:23PM 20   So, for instance, when the PSR was made by Mr. Queener,

21   he went over to the ICAC unit, and at that point, some

22   of the computer items had been seized.  Not all of them

23   had been forensically looked at with numbers.

24              So what -- the numbers that came up that we had

25   were numbers just from a few of the items, not all of

them.  So, in other words, again, that was a very

conservative estimate which put us at the above 600,

which is the most that you can get anyway.

None of these, by the way, were counted

(indicating).  Now, what is important about these --

And if we could -- if we could go back to 3, if

we could.

You will see where the red line is.  That was

generically pulled.  And we pulled a picture out of Red

02:24PM  Bull Fat Girl.

Okay.  And why it's relevant -- and I'm going

to show you a couple of other photos that have been

sanitized.

But if we could go to Exhibit 13.

(Government's Exhibit 13 was marked for

identification.)

MS. KOLMAN:  And this, Your Honor, is, also, I

believe, in paragraph 25 of the PSR, which has been

admitted with no objection.

02:24PM  You will see there, this is one of our known

victims.  She had taken a screen shot from her texting

with the defendant.  And you will see down at the bottom

where he is threatening her.  And what I'm going to be

showing you is that that's a pattern.  He threatens them

and tells them exactly what he wants.

1      And so what we saw when we were going through
2  the folders is that there is a pattern of these women
3  having his name on their bodies.

4      And if we could just show Government's
5  Exhibit -- let me put -- this is Government's
6  Exhibit 13.  If I could put that into evidence, please.

7      THE COURT:  Any objection, Mr. Sharp?

8      MR. SHARP:  Your Honor, I don't have an
9  objection.  I would just ask the Court to understand
10 that the ages of these individuals has not been
11 established.  I would ask the Court not to hold any type
12 of adult conduct against Mr. Watson in that regard.

13     THE COURT:  Mr. Sharp, I think with respect to
14 Government's Exhibit 13, this is one of the four
15 identified victims who is a minor.

16     MR. SHARP:  Correct, yeah.  And I don't have an
17 objection about this one.  This one is a minor.  I
18 thought she was going to show a photo.

19     MS. KOLMAN:  I am.  And I will indicate that.

20     THE COURT:  Let's address Government's
21 Exhibit 13 first.

22     MR. SHARP:  Okay.

23     THE COURT:  13 will be admitted with no
24 objection.

25     MR. SHARP:  No objection, Your Honor.

```
1          (Government's Exhibit 13 was received into
2           evidence.)
3          MS. KOLMAN:  Okay.  Let me show you what's been
4  marked as Government's Exhibit 4, which went under the
5  Red Bull.
6          (Government's Exhibit 4 was marked for
7           identification.)
8          MS. KOLMAN:  And I think we can take that off
9  at this point.
10          But, as you can see, the point of that there is
11  that that is, in fact, historically what we are seeing
12  in these folders where it is girls where the direction
13  is to put "Property of Master P."  As you saw, "I am a
14  fat slut."  That is a picture that --
15          THE COURT:  Ms. Kolman, I have a few questions
16  about --
17          MS. KOLMAN:  Sure.
18          THE COURT:  -- the image.  Is that an image of
19  one of the four minors that have been identified?
20          MS. KOLMAN:  It is not, no.
21          THE COURT:  Do we know whether that woman was a
22  minor or an adult?
23          MS. KOLMAN:  That, we do not.
24          THE COURT:  Okay.
25          MS. KOLMAN:  We do not.
```

1    THE COURT:  And do we know how that woman came

2    to have the writing on her body that was present?

3    MS. KOLMAN:  We do not.

4    Now, and if my agent had been brought -- had

5    been put on the stand, what he would have told you is:

6    On that victim, he could not say because he did not see

7    the face.  And the body is something where it was

8    questionable.  That would not have been counted.

9    THE COURT:  Okay.

02:27PM  10    MS. KOLMAN:  Okay?  And if I could show 6-A.

11    (Government's Exhibit 6-A was marked for

12     identification.)

13    MS. KOLMAN:  Okay.  If we could take that off.

14    THE COURT:  I'm sorry; I was taking notes.

15    MS. KOLMAN:  I'm sorry.  6-A, we can take that

16    down.

17    Okay.  Now, let me show you just Government's

18    Exhibit 6 that goes along with that.

19    (Government's Exhibit 6 was marked for

02:27PM  20     identification.)

21    MS. KOLMAN:  Okay.  And you can take that down.

22    Again, those two photographs were in where you

23    saw Ginger Bitch.  That's two of the photos that were in

24    there.

25    What the agent would have told you would have

```
 1   been just the face and her -- you can't see her breasts,
 2   but -- so that in and of itself would not have been
 3   counted.
 4        The other picture, because they would associate
 5   that picture with her face, the agent would have told
 6   you that, yes, they would have counted that because of
 7   the body shape, the face.
 8        THE COURT:  Okay.
 9        MS. KOLMAN:  Just as a tutorial.
10        THE COURT:  Ms. Kolman, for clarification --
11        MS. KOLMAN:  Yes.
12        THE COURT:  -- Government's Exhibit 6-A would
13   have been counted, but Government's Exhibit 6 would not
14   have been counted?
15        MS. KOLMAN:  That is correct.  That is correct.
16        And, again, you saw the verbiage on there.  The
17   government cannot tell you how she came to have that
18   direction.  But we are simply showing these to you to
19   demonstrate a pattern.  She is not one of the victims
20   who came forward.  Okay?
21        And, finally, if I can show 9.
22        (Government's Exhibit 9 was marked for
23         identification.)
24        MS. KOLMAN:  Okay.  And if we can take that
25   down.
```

02:28PM  (line 10)
02:29PM  (line 20)

1          That, again, is another one for the

2   indication -- we were prepared again to show that.

3   There you can see that fits into the sadomasochism with

4   the candle wax, and, again, the names.  We do not have a

5   face with that.

6          I think on that one, you would not -- would you

7   have counted that as a child?

8          That one would not have been counted as child

9   pornography.  But, again, that goes to show you the

02:29PM 10  pattern that went with the threats that you have seen.

11          Now, I think these things are very important

12  when you are talking about the situation of whether or

13  not you want to depart based on other cases because here

14  you have -- in this case, there is clearly way more than

15  four victims.  We have four known victims.  And isn't

16  that enough?  Enough that these children -- every single

17  one of them indicated that they were thinking of killing

18  themselves because of this and they came forward.

19          I think it's important to take into

02:30PM 20  consideration the defendant was college educated, and at

21  the time, we're talking about a three-year time span,

22  because, yes, in fact, he was working at that cellphone

23  store for a short period of time.  He did the same

24  thing.  He got a misdemeanor, and he went back out and

25  did it again.

1    And you're not talking about a few kids.
2  You're talking about a girl from Virginia.  You're
3  talking about a girl from North Carolina.  You're
4  talking about a girl from Sweden.  I believe Minnesota
5  was our other one.  These are all over.  These are just
6  our known girls.  You have got dozens of unidentified
7  victims that are literally all over the world.

8    The other fact that exacerbates this situation
9  is the threats that he made.  You saw one of those
02:31PM 10  threats.  They're very specific.  And it is also in the
11  PSR.  He did, in fact, distribute because when law
12  enforcement took over AN's persona on the social media,
13  to prove that he had those pics and that he was willing
14  to do it, he sent those to her, which is really one of
15  the counts which drove up his numbers.  All right?

16    Most importantly, Your Honor, is his choice of
17  victims.  This is a now 30-year-old man.  He could have
18  chosen any age bracket that he wanted, but he chose what
19  I call tweeners, those young -- they're not quite, you
02:32PM 20  know, the older teens, but they're not -- they're right
21  there.  They're those girls that are so fragile.

22    We all have been there as a female girl.  We
23  want to believe that we're so mature.  We're hit with
24  social media, with TV, all these things with sexuality
25  and having a boyfriend and being accepted and having

breasts and being cool and being able to do this, and
now we're being inundated with this social media that
you have to be on or else you're nobody.  And you want
to be cool and you want to be confident, but you don't
have the mental capacity yet.  Your brain literally is
not developed enough.  And that's why we have these laws
for predators like this defendant.  That's his choice to
go after all those girls who want to be older, think
they can handle it.  But that's just the thing, they
can't.

          And you saw where they were talking about
killing themselves.  This isn't just an idle threat for
these girls.  I don't know if the Court's aware, but
there is a very famous case, Amanda Todd from British
Columbia.  It's a very powerful thing.  But this all
started -- the same kind of thing.  Guy asked her to
show her breasts.  She lifted it up, and the horrible
things that happened after that.  She ended up doing a
nine-minute video just telling everything that happened.
The next day, she hung herself.  These girls will do
that.

          You know, the victim from Sweden
couldn't -- didn't want -- she came forward, but she was
just beyond herself.  She didn't want her parents to
know.  He was threatening to send all these things out

to her school, and all she had wanted from him was to be

able to have help with her homework.  And now she was

threatened that her whole life -- and to her, that is

her whole life is her school.  These aren't things that

we can minimize just because they're 15-year-olds.  They

will take their lives because of this.

Because of these threats, he doesn't just go

away when they said, "I don't want to do it anymore."

He demanded more.

And that was his job that was going on, by the

way.  He wasn't working.  He was literally laying on his

bed, and he could roll over and there was the computer.

And he was day and night with the amount of these

people.  That was his choice.  He kept it up.  He could

have let them go when they didn't want to do it anymore,

but that made him mad and he threatened them.

Your Honor, I heard Mr. Sharp talking about his

remorse.  I'm not really sure that's true.  Let me show

you what's been marked as Government's 11, which is

texting messages that go back and forth from the jail.

They have -- the agents can pick these up.  The

defendants have no expectation of privacy.  And I tender

this in as Government's Exhibit 11.

(Government's Exhibit 11 was marked for

identification.)

```
 1              THE COURT:  Mr. Sharp, any objections to
 2   Government's Exhibit 11?
 3              MR. SHARP:  No objection, Your Honor.  But I do
 4   want an opportunity to respond to a lot of this.
 5              THE COURT:  Absolutely, Mr. Sharp.  We'll give
 6   you that opportunity.
 7              MR. SHARP:  Thank you, Your Honor.
 8              MS. KOLMAN:  Okay.  I think here it's --
 9              THE COURT:  Ms. Kolman, if you'd just give me a
10   second to actually read the text message.
11              MS. KOLMAN:  Sure.  Yes.
12              THE COURT:  Thank you.
13              MS. KOLMAN:  Okay.  A little bit further down
14   in 11, I pulled out this section (indicating).
15              THE COURT:  Is 11 a compendium of text
16   messaging?  I'm only seeing a piece of it here.
17              MS. KOLMAN:  Your Honor, it's a long text, and
18   a lot of it is talking about things he's talked about
19   with his attorneys, which is why I pulled out --
20              THE COURT:  Okay.
21              MS. KOLMAN:  -- just specific parts.
22              So if you could go to the next --
23              All right.  And so what we're seeing here, Your
24   Honor, is that -- I think this kind of speaks to it, and
25   I -- I don't think that he even -- he had so many
```

victims that he didn't even know which ones came and
made these cases against him.  And I don't know if there
is anything else, but that certainly speaks volumes to
the amount of people that were affected by this
defendant.

And if we could go to Government's Exhibit 12,
which is another --

THE COURT:  Ms. Kolman, just briefly --

MS. KOLMAN:  Yes.

THE COURT:  -- to make sure the record is
clear, Mr. Sharp, you have no objection to 11 in its
current form?  Do we need to redact it?  What's its
current state?

MR. SHARP:  That's a good question, Your Honor.
I probably need to read the entire thing.  I think we're
missing some context in this particular email.  I
understand Ms. Kolman's concern about things that he had
spoken with me about.  There is actually quite a bit
that he had spoken to me about.

THE COURT:  Mr. Sharp, have you been given a
copy of Government's Exhibit 11?

MR. SHARP:  I do have it, Your Honor, yes.

MS. KOLMAN:  I can --

THE COURT:  The parties can appreciate that the
record needs to be clear in a case like this.

1      MS. KOLMAN:  Why don't I -- I'm not going to

2  move to tender it at this point.  And we can discuss

3  that.  Whatever he wants to do.

4      THE COURT:  Thank you.  That's fine.

5      MS. KOLMAN:  And I'll just go on with 12,

6  which, again, I did parse out.  And I'll not try to

7  tender it at this point, and I'll let Mr. Sharp and I

8  discuss that.

9          (Government's Exhibit 12 was marked for

02:38PM 10          identification.)

11      MS. KOLMAN:  But this, Your Honor, goes to the

12  restitution with regards to the victim of the BluePillow

13  series.  And this is -- the BluePillow series is one of

14  the series -- in other words, that NCMEC has identified

15  this little girl, and she -- every time a defendant has

16  one of hers, it gets sent to NCMEC.  They identify it

17  and they send it back to us and they say, okay, as in

18  this case, there are 49 of those, and then we get

19  information from their attorneys; if they want to go

02:39PM 20  forward, how much money they want, what have you.

21      In this case, the government contacted their

22  attorney and said, "I think what's best is probably the

23  minimum," and they were fine with that.

24      But, again, here is his attitude towards this

25  child, which, by the way, she was molested and had CP

```
1   produced on her from the time she was five through 12
2   years of age.  So --
3               THE COURT:  Ms. Kolman, so the record is clear,
4   you're not moving Government's Exhibit 12?
5               MS. KOLMAN:  Not at this point.  I will -- yes.
6               So I think those are very poignant to indicate
7   the defendant's -- you know, just his whole feelings
8   about what he's done to these girls.
9               I would like to speak shortly about his -- I'm
10  sorry the defendant was abused, if that is, in fact, the
11  case.  I'm sorry that he has mental illness; that -- his
12  bipolar, his obsessive-compulsive; that his father
13  passed away and that he was homeless for a while.  Those
14  things are all probably true.
15              Here is the part that's missing, and it's a big
16  part, is that there is absolutely no connection between
17  any of those things or all of them together to show why
18  he did this to all these girls, and why he did it even
19  after he had been convicted in 2016, and went full
20  board.  I mean, he didn't dabble in it; he went into the
21  deep end.
22              And so I think that speaks loudly to the 3553
23  factors about making our community safe and the
24  deterrent factor, the specific deterrent factor.  I
25  think the -- as I got into this case and as I started
```

02:40PM (line 10)
02:40PM (line 20)

1    looking at it, I understand the concern that it's not a

2    contact sex crime. But when you start looking at it and

3    you delve into it and you talk to these girls and you

4    see the angst that they're going through and just the

5    number of girls that are going to be affected for the

6    rest of their lives, that is not something that we can

7    just take lightly. And so the government's thought

8    would be that 30 years would be appropriate.

9          Nothing further.

02:42PM 10          THE COURT: Mr. Sharp, I'd allow you rebuttal.

11          MR. SHARP: Thank you, Your Honor.

12          And there was a lot there, certainly. I just

13   want to clarify some things. And by no means am what I

14   going to argue at this point is to try to distract from

15   Mr. Watson's remorse for his conduct. I just want to

16   put some of this in context of what we're dealing with.

17          And I think the first thing I would point out

18   are the computer screens that were shown that had the

19   list of names and the images next to the list of names.

02:42PM 20   I think one actually speaks to Mr. Watson's mental

21   illness, particularly when it comes to OCD. I mean, he

22   was very much obsessive-compulsive, and he did file

23   these things and he did put them in names.

24          And speaking to Mr. Watson very early on in

25   this case, many of these individuals, the vast majority

1   of the individuals are adults that he was in contact

2   with.  These aren't -- there is not proof that there

3   are, you know, dozens and dozens of female victims all

4   across the world.  We just don't have that.

5          The reality is that he was meeting these

6   individuals in specific chat groups, and some of them

7   were S&M chat groups that there is -- there is

8   everything out there for everyone and people congregate

9   in these specific places and they know where to find

02:43PM  10   each other.

11          So a lot of those photos, one, were adults,

12   and, two, were consensual adults that were doing these

13   things; you know, that were doing the things with the

14   hot wax and they were writing on themselves.

15          I'm not trying to minimize what happened to

16   these victims.  That's completely different.  But I also

17   don't want Mr. Watson to be punished for things that

18   consenting adults were doing that are connected -- you

19   know, the internet makes the world a much smaller place

02:44PM  20   when it comes to internet connectivity.

21          So I think this idea that he's out hunting for

22   tweeners is a little misplaced.  Certainly he came

23   across teenagers and started these back-and-forth

24   conversations and committed these offenses for which

25   he's come in and pled guilty and acknowledged, and did

```
 1   so very, very early.  But a vast majority of the things
 2   that were on these hard drives was completely legal
 3   between consenting adults; right?  Now, not the stuff
 4   with the minors, and that's not what I'm talking about.
 5              THE COURT:  Mr. Sharp, have you reviewed these
 6   hard drives in full such that you can make that type of
 7   assertion to the Court, "a vast majority"?
 8              MR. SHARP:  Your Honor, based on the photos
 9   that they show, those three pages of that hard drive, I
10   have worked with this investigative unit long enough to
11   know that if there were dozens and dozens of female
12   victims that they would have brought them forth.  That's
13   what they do.
14              THE COURT:  Okay.
15              MR. SHARP:  So when you look at the number of
16   images that he's actually held accountable for that are,
17   in fact, classified as child pornography, there are tons
18   more images on these devices that are not counted that
19   are adults, and clearly are adults.  And I don't think
20   that that's a misrepresentation.  There is clearly adult
21   pornography on these devices.  And I would say that the
22   majority of it is adult pornography.
23              Mr. Watson does have obsessive-compulsive
24   disorder.  He did file these things.  A lot of those
25   names that you see on those screens are the user names
```

02:44PM (line 10)
02:45PM (line 20)

of the individuals that are posting these pictures.  So
when he saved them, he saved them under the name that
the individual used on their screen.  He wasn't renaming
every person that he took a photo of.

So that's what I talk about when I'm talking
about context of what we're pulling out on some of these
devices, Your Honor.

And in regard to the email communications or
the text communications from the Blount County jail that
he sent to family members, the first one, Your Honor,
this was the November 30th, 2020, I would note the time
of which it was sent was 4:58 a.m.  And, again, you have
to -- you'd have to --

THE COURT:  And, Mr. Sharp, again, I think we
need to be a little more precise with the record here.
Is that Government's Exhibit 11 or Government's
Exhibit 12?

MR. SHARP:  That is Government's Exhibit 11,
Your Honor.

THE COURT:  Okay.  Government's Exhibit 11.

MR. SHARP:  Yeah.

THE COURT:  Okay.

MR. SHARP:  And that was the one -- I would ask
that the entirety of that email be presented, Your
Honor.  I understand the government's concern, but I

1    don't believe that there is anything in there --

2            THE COURT:  Mr. Sharp, before we move any

3    further on this, this has been a little bit less than

4    precise.  At this point, it may be helpful for the

5    Court, and perhaps even the parties, to take a brief

6    recess for the parties to take a look at Government's

7    Exhibit 3, 13, 6-A, 6, 11, and 12 and make proper

8    determinations as to whether there are objections to any

9    or all of those exhibits.  Then the Court will have a

02:47PM 10   full record upon which to make these types of

11   determinations and counsel can make focused arguments

12   based on what is in and out of the record.

13           MR. SHARP:  Yes, Your Honor.

14           THE COURT:  Okay.  The Court is going to take

15   a -- well, would ten minutes be permissible, Mr. Sharp?

16           MR. SHARP:  I think that would be sufficient,

17   Your Honor.

18           THE COURT:  Okay.  Ms. Kolman, same question:

19   Would ten minutes be sufficient to review --

02:47PM 20           MS. KOLMAN:  Yes.

21           THE COURT:  -- those exhibits that have already

22   been shown to the Court --

23           MS. KOLMAN:  Yes.

24           THE COURT:  -- and not admitted?

25           MS. KOLMAN:  Sure.

```
 1              THE COURT:  Okay.  The Court is going to take a
 2   ten-minute recess until 3 o'clock.
 3              MR. SHARP:  Thank you.
 4              THE COURTROOM DEPUTY:  All rise.  This
 5   honorable court stands in recess until 3 o'clock.
 6              (A brief recess was taken.)
 7              THE COURTROOM DEPUTY:  Please remain seated and
 8   come to order.
 9              THE COURT:  The parties have provided to the
10   government a list of the -- or -- I'm sorry.
11              The parties have provided to the Court a list
12   of the government's exhibits that have been shown in
13   some form during today's sentencing hearing.
14              Mr. Sharp, do you have a copy of this list?
15              MR. SHARP:  We just reviewed it, Your Honor,
16   but I don't -- it was -- let me just make sure, Your
17   Honor.  I know it's 3, 13, 6-A, 11, and 12.  Those were
18   the five government exhibits that I --
19              THE COURT:  That is not consistent with the
20   list that the Court has been given.
21              Okay.  Give us just a second.  The Court will
22   make a copy of the list that it's been given and then
23   we're all working off of the same song sheet.
24              Mr. Sharp, I'll give you a second to look over
25   that form.
```

03:12PM (line 10)
03:13PM (line 20)

1          MR. SHARP:  Yes, Your Honor, that looks
2    complete to me.
3          THE COURT:  Here is what we're going to do:
4    We're going to look at each of these exhibits.  I'm
5    going to indicate to the parties whether the Court has
6    made a ruling on that exhibit, and if we need to hear
7    further objections as regards to each of those exhibits,
8    we will do so.
9          May I ask the government to pull up the
03:15PM 10   document that the they have marked as Exhibit 3.
11         Ms. Kolman, I understand that Exhibit 3 has a
12   number of pages.  Is the page that we're seeing the sole
13   page that is attributable to Exhibit 3 as opposed to 3-A
14   or 3-B?
15         MS. KOLMAN:  That is correct.  This is 3.
16         THE COURT:  Mr. Sharp, you have in front of you
17   Exhibit 3.  The Court had previously admitted Exhibit 3.
18   Does Mr. Watson have any objections to the admission of
19   Exhibit 3?
03:15PM 20         MR. SHARP:  No objection, Your Honor.
21         THE COURT:  Okay.  Ms. Kolman, may I ask you to
22   bring up Exhibit -- the exhibit that's been marked as
23   Exhibit 3-A by the government.
24         MS. KOLMAN:  This is 3-A, Your Honor, that's on
25   the screen now.

                    THE COURT:  Ms. Kolman, by the government's --
or by the Court's count, 3-A has not been moved.
Ms. Kolman, would you move 3-A?

                    MS. KOLMAN:  Yes, I would tender -- move to
tender 3-A into evidence at this time.

                    THE COURT:  Mr. Sharp, does Mr. Watson have any
objections to the admission of Government's Exhibit 3-A?

                    MR. SHARP:  No objection, Your Honor.

                    THE COURT:  Okay.  Ms. Kolman, will you bring
up Government's Exhibit 3-B.  The Court has not made any
determination as to 3-B.  Would the government tender
3-B?

                    (Government's Exhibit 3-B was marked for
                     identification.)

                    MS. KOLMAN:  Yes, Your Honor, the government
would move to tender 3-B into evidence at this time.

                    THE COURT:  Mr. Sharp, do you have any
objection to the admission of 3-B?

                    MR. SHARP:  No objection, Your Honor.

                    THE COURT:  Okay.  Dealing with all three of
these exhibits at once, to make sure that the record is
clear, Government's Exhibit 3 is admitted with no
objection; Government's Exhibit 3-A is admitted with no
objection; Government's Exhibit 3-B is admitted with no
objection.

1          (Government's Exhibits 3, 3-A, and 3-B were

2           received into evidence.)

3          THE COURT:  Ms. Kolman, will you please pull up

4    Government's Exhibit 4.

5          MS. KOLMAN:  That's Government's Exhibit 4,

6    Your Honor.

7          THE COURT:  Ms. Kolman, the Court has made no

8    determination as to Government's Exhibit 4.  Would the

9    government move for the admission of Government's

03:17PM  10    Exhibit 4?

11          MS. KOLMAN:  Yes, Your Honor, government

12    tenders Government's Exhibit 4 into evidence at this

13    time.

14          THE COURT:  Mr. Sharp, does Mr. Watson have any

15    objection to the admission of Government's Exhibit 4?

16          MR. SHARP:  No objection, Your Honor.  I do ask

17    for the opportunity to respond to rebut some of these.

18          THE COURT:  Okay.  Mr. Sharp, right now we're

19    just dealing with the admissibility of the specific

03:17PM  20    exhibits so the record is clear.  Sentencing

21    recommendations, 3553(a) analysis will be completed

22    after we've gotten through this precise process.

23          MR. SHARP:  Thank you, Your Honor.  No

24    objection.

25          THE COURT:  Government's Exhibit 4 will be

1   admitted with no objection.

2           (Government's Exhibit 4 was received into

3            evidence.)

4           THE COURT:  Ms. Kolman, will you please bring

5   up Government's Exhibit 6.

6           MS. KOLMAN:  Your Honor, this is Government's

7   Exhibit 6 on the screen.

8           THE COURT:  The Court has made no determination

9   as to the admissibility of Government's Exhibit 6.

03:18PM  10        Ms. Kolman, would the government -- or -- I'm

11   sorry.  The Court has made no determination as to the

12   admissibility of Government's Exhibit 6.  Would the

13   government like to tender Government's Exhibit 6?

14           MS. KOLMAN:  Yes, Your Honor, the government at

15   this time tenders Government's Exhibit 6 into evidence,

16   please.

17           THE COURT:  Mr. Sharp, does Mr. Watson have any

18   objection to Government's Exhibit 6?

19           MR. SHARP:  No objection, Your Honor.

03:18PM  20        THE COURT:  Government's Exhibit 6 will be

21   admitted.

22           (Government's Exhibit 6 was received into

23            evidence.)

24           THE COURT:  Ms. Kolman, will you please pull up

25   Government's Exhibit 6-A.

```
 1              MS. KOLMAN:  This is Exhibit 6-A, Your Honor.
 2              THE COURT:  Okay.  Again, the Court has not
 3      made a determination as to the admissibility of
 4      Government's Exhibit 6-A.  Would the government like to
 5      move Exhibit 6-A?
 6              MS. KOLMAN:  Yes, the government requests that
 7      6-A be tendered into evidence at this time.
 8              THE COURT:  Mr. Sharp, does Mr. Watson have any
 9      objections to Government's Exhibit 6-A?
10              MR. SHARP:  No objection, Your Honor.
11              THE COURT:  6-A will be admitted.
12              (Government's Exhibit 6-A was received into
13               evidence.)
14              THE COURT:  Ms. Kolman, will you please pull up
15      Government's Exhibit 9.
16              MS. KOLMAN:  This is 9, Your Honor.
17              THE COURT:  The Court has not made any
18      determination as to the admissibility of Government's
19      Exhibit 9.  Would the government tender Government's
20      Exhibit 9 at this time?
21              MS. KOLMAN:  Yes, Your Honor, government
22      tenders Government's Exhibit 9 into evidence, please.
23              THE COURT:  Mr. Sharp, does Mr. Watson have any
24      objection to the admissibility of Government's
25      Exhibit 9?
```

03:19PM (line 10)
03:19PM (line 20)

                    MR. SHARP:  No objection, Your Honor.

                    THE COURT:  Okay.  Government's Exhibit 9 will

be admitted with no objection.

                    (Government's Exhibit 9 was received into

                     evidence.)

                    THE COURT:  Government's Exhibit 11.

Ms. Kolman, can we pull that up?

                    MS. KOLMAN:  Yes.  Your Honor, we are going to

pull up the full text at this time, to which we both

agree.

                    THE COURT:  Okay.

                    MS. KOLMAN:  And that is what is on the screen.

                    THE COURT:  In terms of the situation with this

particular exhibit, the Court had admitted the exhibit,

but then we had a late objection.  So right now we're

going to wipe that slate clean.

                    Ms. Kolman, would the government move

Government's Exhibit 11 in its current form to be

admitted in this hearing?

                    MS. KOLMAN:  Yes, Your Honor.  The government

would move to tender Government's Exhibit 11 into

evidence at this time.

                    THE COURT:  Okay.  Mr. Sharp, any objection to

the admission of Government's Exhibit 11?

                    MR. SHARP:  No objection, Your Honor.

1    THE COURT:  Okay.  Mr. Sharp, the Court notes

2  that Government's Exhibit 11 appears to relay some

3  communications that you may have had with Mr. Watson.

4  Mr. Watson has an attorney/client privilege to keep

5  those records safe and off of the Court's docket as a

6  matter of course, but Mr. Watson can waive that

7  privilege if he would like to do so and finds it to be

8  advantageous.  Is that something that he would like to

9  do now with respect to Government's Exhibit 11?

03:21PM  10    MR. SHARP:  Yes, Your Honor, he would waive

11  attorney/client privilege with respect to Exhibit 11.

12    THE COURT:  Thank you.  With that, the Court

13  will admit Government's Exhibit 11.

14    (Government's Exhibit 11 was received into

15     evidence.)

16    THE COURT:  Next document that I have is

17  Government's Exhibit 12.  Can we pull up Government's

18  Exhibit 12.

19    MS. KOLMAN:  Your Honor, at this time, the

03:21PM  20  government is pulling up the entirety of Government's

21  Exhibit 12 for the Court.

22    THE COURT:  Okay.  The Court's not made a

23  determination as to Government's Exhibit 12.  Would the

24  government like to move for the admission of

25  Government's Exhibit 12?

1          MS. KOLMAN:  Yes, Your Honor, at this time, we

2     would ask that Government's Exhibit 12 in its entirety

3     be tendered into evidence.

4          THE COURT:  Okay.  Mr. Sharp, does Mr. Watson

5     have any objection to the admission of Government's

6     Exhibit 12?

7          MR. SHARP:  No objection, Your Honor.

8          THE COURT:  Just as with Government's

9     Exhibit 11, Government's Exhibit 12 appears to relay

03:21PM 10    some information that might have come from Mr. Sharp to

11    Mr. Watson.  Again, Mr. Watson has attorney/client

12    privilege rights.  He may waive those rights if he would

13    like to do so.  Is that something that he would like to

14    do here?

15         MR. SHARP:  Yes, Your Honor, he would waive

16    attorney/client privilege as it relates to Exhibit 12.

17         THE COURT:  Okay.  The Court will admit

18    Government's Exhibit 12 noting the waiver of privilege.

19              (Government's Exhibit 12 was received into

03:22PM 20              evidence.)

21         THE COURT:  And last, from my count, we have

22    Government's Exhibit 13.

23         Ms. Kolman, will you please pull up

24    Government's Exhibit 13.

25         MS. KOLMAN:  Yes, Your Honor.

1          THE COURT:  Does the -- the Court had

2     previously admitted Government's Exhibit 13, but, for

3     the avoidance of any doubt, is going to give Mr. Sharp

4     an opportunity to object at this time.

5          MR. SHARP:  No objection, Your Honor.

6          THE COURT:  Okay.  With that, Government's

7     Exhibit 13 will be fully admitted with no objection from

8     Mr. Watson.

9          Okay.  By the Court's count, those are all of

03:22PM 10   the government's exhibits that we have viewed in some

11    form today at this hearing.

12         Ms. Kolman, does that match your recollection

13    and record?

14         MS. KOLMAN:  It does, Your Honor.  Thank you.

15         THE COURT:  Mr. Sharp, does that match your

16    recollection and record?

17         MR. SHARP:  Yes, Your Honor.  Thank you.

18         THE COURT:  Okay.  That brings us back to the

19    parties making their arguments with respect to an

03:23PM 20   appropriate sentence, any variances, and the 3553(a)

21    factors.

22         Before I allow Mr. Sharp a brief additional

23    period of time to address any remaining issues that need

24    to be addressed before sentencing, Ms. Kolman, at the

25    end of your last statements, you suggested that a

1  sentence of 30 years would be appropriate.  That is

2  inconsistent with the previous sentencing memo that the

3  United States had filed but something that the United

4  States is actually permitted to do.

5        To make sure that the Court understands the

6  United States' recommendation in this case, is the

7  United States recommending a downward variance to a term

8  of 30 years' imprisonment?

9        MS. KOLMAN:  Yes, Your Honor, we believe that

03:23PM 10  that would be sufficient, but not greater than

11  necessary.

12        THE COURT:  Thank you, Ms. Kolman.

13        With that, Mr. Sharp, I'll permit you a brief

14  opportunity to present additional argument.

15        MR. SHARP:  Yes, Your Honor.

16        And one thing that I do want to clarify, in

17  speaking with Detective Williams during the recess, I

18  don't want to be misconstrued in any way on my

19  representations to the Court.

03:24PM 20        The amount of material that was found on these

21  computers, much of it was unable to be determined and

22  whether it was adult or not adult pornography.  So I

23  didn't mean to give the impression, but there wasn't a

24  situation where Mr. Watson would have been charged under

25  those circumstances.  And my biggest concern is that we

hold any type of speculation against Mr. Watson. I know
that the Court doesn't want to do that. I know the
government doesn't want to do that, and that was really
my argument when we're talking about all these
additional images that were found on those computers.
So --

THE COURT: Mr. Sharp, thank you for that
clarification. The Court appreciates it. And I'll tell
you, the Court is not going to consider the statement
03:25PM 10 that you made with respect to sentencing.

MR. SHARP: All right. Thank you, Your Honor.

The other exhibit that I do want to take up,
though, Your Honor, was the Exhibit 11; specifically,
the text message from Mr. Watson to his family member
dated November 30th of 2020.

And just to put some context on that, this was
during the period of time that I had received the PSR
report. I was surprised with the findings in the report
because they did not come close to my own calculations.
03:25PM 20 Due to COVID restrictions, I could not see Mr. Watson.
As a course of practice, I do not send PSRs of this
nature to the jail for client safety concerns.

I was able to secure a phone call with
Mr. Watson shortly before this date in late November.
Although I had the PSR for several weeks, we had a lot

1   of communication issues during this period of time with

2   clients.  I had gone over that, and I expressed to him

3   that I was wrong on his guideline calculation.  And I

4   also would think it's important to recognize that the

5   time of day of that email was 5 a.m. in the morning.  I

6   think 4:58.

7           THE COURT:  Mr. Sharp, just a brief clarifying

8   question on that.  You were wrong because you had not

9   taken into account the expanded relevant conduct and you

03:26PM  10  later learned about that expanded relevant conduct.

11          MR. SHARP:  Exactly, Your Honor.  When we

12  signed the plea agreement, we did not have the relevant

13  conduct information.  So he was under the impression,

14  and rightfully so, because that's what I had told him,

15  that the guideline range was 188 to 210 when we signed

16  the plea agreement.  And then by the time -- and this

17  case was delayed multiple times due to the pandemic.

18          You know, there is argument to be made that had

19  it not been delayed, those analytics would not have come

03:26PM  20  back.  He would have been sentenced before that

21  happened.  But that's neither here nor there under

22  the --

23          THE COURT:  Mr. Sharp, just, again, to make

24  sure the record is clear on this, the plea agreement

25  also contains an admonition that these may not be all of

1   the facts relevant to the case and there may be

2   additional facts that are relevant to sentencing; isn't

3   that right?

4           MR. SHARP:  That's correct, Your Honor.  And

5   certainly Mr. Watson doesn't say that anything that I

6   told him was binding, because it's not.  And that's

7   handled in the change of plea as well; that it's not a

8   binding -- anything that his attorney tells him is not

9   binding on the Court as far as guideline sentences go.

03:27PM 10          But as far as context of this particular text,

11  he had just found out that he was looking at 15 to 20

12  and now he's looking at life.  So he was upset.  Very

13  understandably, he was upset with me.  And I do not

14  begrudge him that at any point during that conversation

15  that we had because I was delivering some very bad news

16  to him.

17          His frustration, though, was with myself.  It

18  was with the government.  And I don't want anything that

19  is in there to be taken out of context.  And I know he

03:27PM 20  puts a line in there that any guilt that he felt he no

21  longer feels.  That was a frustrated 5:00 a.m. text to

22  his sister after he found out that his guidelines had

23  essentially doubled.

24          So I would just ask the Court to take it in

25  that time frame and in the context of which it actually

occurred.  And I don't want it to be construed as
something that he does not have remorse for these
victims.  I've met with him several times since that
date.  He has expressed remorse to me on multiple
occasions.

And in addition to Exhibit 11, Your Honor,
Exhibit 12, a lot along the same lines.  You know, we
did agree to a $3,000 restitution figure.  Mr. Watson is
not the first client I've had that didn't realize that
downloading images, you have to pay the victims of the
images that are known.  I think a lot of people don't
understand the reach and the damage that it does to
these individuals.

THE COURT:  Mr. Sharp, I may be able to limit
some of your argument here.  I'll tell you:  The Court
is not moved by Government's Exhibit 11 or 12.

MR. SHARP:  Okay.  Your Honor, if that is the
case, then I have nothing further to add.  I just wanted
to make sure that that wasn't going to be a detriment to
Mr. Watson.

THE COURT:  Thank you.

MR. SHARP:  Thank you, Your Honor.

THE COURT:  Ms. Kolman, given the length of
time that we've spent here today, I would give you a
brief two minutes if you'd like to add anything further.

1      MS. KOLMAN:  No, thank you, Your Honor.

2      THE COURT:  Okay.  Mr. Watson, you have the

3  right to make a statement or to present any information

4  to mitigate the sentence in this case.  Do you wish to

5  make a statement or to present any information?

6      THE DEFENDANT:  I would like to, Your Honor, if

7  I may.

8      THE COURT:  Mr. Watson, please proceed.

9      MR. SHARP:  Do you want him at the podium, Your

03:29PM  10  Honor, or at counsel table?

11      THE COURT:  Mr. Watson, please remain at

12  counsel table.

13      THE DEFENDANT:  Yes, ma'am.

14      Your Honor, before I begin, I do want to

15  apologize briefly if I seem disjointed in what I'm

16  saying.  It's very difficult to prepare what I was going

17  to say because this date has changed not only so many

18  times, but, also, as my attorney has said, I'm an

19  obsessive-compulsive.  I have probably gone over what

03:30PM  20  I'm going to say thousands of times.

21      I've been in Blount County for 22 months now,

22  and there is not much more to do than think.  And last

23  night, after I was going over what I was going to say

24  and I was about to try to get some sleep, I did

25  something that I don't typically do.  I actually said a

```
 1   prayer.  I said, "God, if I'm not supposed to say this,
 2   send me some kind of sign.  This is the last chance for
 3   me to not screw up about what I'm supposed to say."  And
 4   then something very strange happened.  Not even two
 5   minutes later, some people came up and an altercation
 6   happened in front of me, in front of all of us.  One of
 7   the young men in there, he's Hispanic and he can't speak
 8   English, and no one understands what he's saying.  And
 9   the altercation started over them not comprehending each
10   other, basically.  He was confused.  He didn't get why
11   people had a problem, basically.
12           I feel that we, as a country, almost, are in
13   that kind of situation with people with mental illness
14   because we're not -- we're not asking questions of how
15   and why and we're so focused on what happens that we
16   don't -- we don't fully get the breadth of where it
17   comes from.  And if we don't understand the root of the
18   problem, we're just going to be putting Band-Aids on it.
19   We're going to be stopping the symptoms, not the
20   illness.
21           But what was so strange, Your Honor, is:  At
22   the end of the altercation, the young man who speaks
23   Spanish -- I speak a little bit of Spanish.  I
24   understood most of what he was saying.  He
25   actually -- he said to the other man, "I'm sorry for
```

what you're going through."  The man who started the
fight with him, he said, "I'm sorry for what you're
going through.  We don't deserve to go through this
together.  I forgive you."

At that moment, I realized I will never get the
opportunity to apologize to these people.  I know
exactly who these girls are, Your Honor.  My memory does
not allow me to forget many things like that.  I will
never get to look them in the eye and say, "I am sorry
for what I did to you.  I am sorry for us being in this
situation together.  I'm sorry for whatever the
circumstances were that even brought you to this
situation as well.  I can't make it better.  I can only
tell you that I will do everything I can to make it up
to other people."

Your Honor, when we don't understand the root
of problems when we have the ability to understand them,
we fear them.  We fear criminals because we don't know
why they do what they're doing.  We fear sex offenders
because we don't know what causes them to behave
different than what we consider normal.  But once we
start understanding and come to grips with mental
illness, we will be able to help more people and we'll
be able to cut down on these problems.

We're seeing it with COVID, with the pandemic;

suicide rates are up, violence is up because people are
having more issues that they can't treat.  And I'm
hoping that you listening to me will let you understand
me a little bit better in a good mental state and
understand that I am not someone to be feared, Your
Honor.

I understand that what I did wasn't just wrong,
it was horrific.  It was something I could argue was
even worse than what was done to me as a child.  But I
hope that you understand that -- that I can't help
people from prison as well.  I'm asking you, if
anything, for the women that are behind me right now,
for them suffering more than I am suffering because they
had nothing to do with any of this.  I did this.  I
deserve to be punished.  These three women behind me and
the rest of my family don't deserve to be punished for
this, but they are.

I'm asking you to give me whatever sentence you
deem appropriate; not even necessarily what you deem is
right, but what you feel is best for everyone involved.

Thank you, Your Honor.

THE COURT:  Thank you.

Mr. Sharp, do you have anything you would like
to add on behalf of Mr. Watson?

MR. SHARP:  No, Your Honor, nothing further.

1    Thank you.

2            THE COURT:  Okay.  Ms. Kolman, would the

3    government like to make a final statement?

4            MS. KOLMAN:  No, Your Honor.  Thank you.

5            THE COURT:  Okay.  The Court appreciates the

6    statements of counsel and the defendant.  The Court has

7    carefully reviewed the Presentence Report and considered

8    the arguments presented by the government and by

9    Mr. Watson.

03:34PM  10        In a manner intended to comply with the Sixth

11   Circuit's jurisprudence since *Booker* rendered the

12   sentencing guidelines advisory and *Gall's* requirements

13   that the Court make an individual assessment based on

14   the facts presented and adequately explain the chosen

15   sentence, the Court will explain its reasons for the

16   sentence to be imposed in this case.

17        In addition to the guidelines range, the Court

18   has considered the factors set forth in 18 United States

19   Code § 3553(a) in fashioning an appropriate sentence for

03:35PM  20   Mr. Watson.

21        First, the Court considers the nature and

22   circumstances of the offense.  Mr. Watson's crimes are

23   serious, directly negatively, and forever impacting the

24   lives of at least four minor victims.  He solicited nude

25   pictures from four minor victims by pretending to be in

relationships with them.  Once he received the images of
child pornography, he blackmailed the victims for
additional images and videos threatening to post their
pictures online or send them to the victim's school if
she did not comply.

His specific demands were extraordinarily
demeaning, including instructions for a victim to mark
her body with his name and for how she should pose
explicitly in pictures that she would send to him.

Further, Mr. Watson victimized many additional
children through the collection of child pornography
stored on his computer and hard drive.  In total, 11,447
images of child pornography were located on Mr. Watson's
computer.  These depictions included particularly vile
images, including bestiality, prepubescent minors under
the age of 12 displaying their genitals in a lewd and
lascivious manner, and the sexual abuse or exploitation
of an infant or a toddler.

But the Court also considers the history and
circumstances of the defendant.  Mr. Watson is 30 years
old.  Mr. Watson has suffered from depression and
anxiety, as well as other mental illness.  Mr. Watson
has regularly used methamphetamine and has experience
with other drugs.

Mr. Watson's criminal record indicates that he

has sexually preyed on a young girl before.  Mr. Watson
was convicted in May 2016 of harassment when he, while
working as a salesperson at a wireless carrier, helped a
15-year-old girl purchase a cellphone.  Mr. Watson then
texted the victim requesting that she send nude photos
of herself to him, including a picture of her vagina.
Mr. Watson acknowledged that he knew the victim was only
15 years old at the time he solicited those photos.

At the time of his conviction for that offense,
Mr. Watson had already begun collecting the images of
child pornography that are part of the expanded relevant
conduct here.

The month prior to his conviction in that case
in April of 2016, Mr. Watson initiated contact with the
first victim in this case.  He would then threaten them
into sending nude photographs.

The law requires a sentencing judge to impose a
sentence which is sufficient, but not greater than
necessary, to achieve the sentencing objectives set
forth in § 3553(a)(2).  That includes the need to
reflect the seriousness of the offense, to promote
respect for the law, and to provide a just punishment.

The instant offenses are extremely serious.
Possession and distribution of child pornography is
exploitative and deprives victims of their agency and

childhood.

Here, Mr. Watson preyed on his victim's trust and naiveté forcing them to send him images of child pornography upon threats of posting on the internet existing sexually-explicit photos they had sent to him. Two of his victims were so distraught by Mr. Watson's conduct that they seriously contemplated suicide.

Mr. Watson understood the seriousness of his offenses, but chose to commit these crimes anyway. In a conversation with one of his victims, he acknowledged the criminality of his behavior stating, and I quote, "Only one person risks jail time right now, and it's not you."

The Court also considers the need for adequate deterrence. General deterrence is necessary for sexual predators who exploit their child victims through the internet and social media applications which obscure the predator's identity and allow the predator to prey on victims worldwide.

As to specific deterrence, Mr. Watson's 2016 conviction for harassment of a minor with sexually-explicit requests did not deter him from engaging in further criminal conduct in victimizing additional minors.

Mr. Watson began threatening his first victim

the month prior to the finality of his harassment
conviction and Mr. Watson continued his criminal conduct
for three additional years.

An extensive term of imprisonment is needed to
deter Mr. Watson from engaging in further criminal
conduct and victimizing more children, and an extensive
period of supervised release is also required for the
same reason.

The Court also considers the need for
protection of the public from further crimes of the
defendant.  Mr. Watson is a danger to our community.
Through the use of the internet and social media
applications within the Eastern District of Tennessee,
Mr. Watson victimized children from other states and
even another country.

Henley, one of Mr. Watson's victims, bravely
described the lasting effects of the abuse she incurred
at the hands of him and other predators after
pornographic images of her as a child were circulated
online.  She writes that feelings of guilt and shame
linger and the effects of the ongoing abuse are
irregular and unpredictable due to PTSD, anxiety, and
triggers.  She described anxiety attacks so acute that
she can't breathe, see, or move, and she may start to
scream or pass out, not remembering what happened when

1   she woke up.  She says that she is scared to leave the

2   house, has an extreme fear of being alone, especially at

3   night.  Due to the ongoing abuse inflicted on the victim

4   by those circulating the images of her as a child, she

5   has to keep her identity secret to protect herself and

6   ensure her safety from pedophiles who have seen her

7   image.

8           She must contend with so-called fan mail and

9   the fear of unexpected encounters in public by

03:42PM  10  predators, making it crippling to go anywhere,

11  especially to go anywhere alone.  Mr. Watson deprived

12  Henley and his other victims of an overall sense of

13  dignity and self worth.

14          The Court also considers the need to provide

15  educational and vocational training and medical care or

16  other correctional treatment.  Mr. Watson has struggled

17  with mental health issues, including thoughts of suicide

18  and substance abuse, and he has experienced serious

19  mental illness.

03:42PM  20          Mr. Watson further reports that he was subject

21  to sexual abuse as a child.  The Court considers these

22  factors and the Court will recommend that Mr. Watson

23  have the opportunity to receive substance abuse and

24  mental health treatment while incarcerated and

25  thereafter.

1          The Court also considers the kinds of sentences

2    available and the kinds of sentences and sentencing

3    range established.  Here, the mandatory minimum for

4    Count One is 15 years with a maximum term of 30 years,

5    and Count Three carries a minimum term of imprisonment

6    of five years with a maximum 20 years.

7          The Court also considered any pertinent

8    Sentencing Commission policy statements and the need to

9    avoid unwarranted sentencing disparities with

03:43PM 10   similarly-situated defendants.

11          Mr. Watson argues in his sentencing memorandum

12   that multiple other defendants convicted of almost

13   identical conduct have received much lower sentences

14   than his guidelines range.

15          While it is true the conduct for which

16   Mr. Watson was convicted, that is, his offense conduct,

17   was initially estimated to yield a lower guidelines

18   range, the guidelines also require consideration of

19   expanded relevant conduct.

03:43PM 20         The expanded relevant conduct here includes the

21   possession of 11,447 images of child pornography

22   processed from Mr. Watson's computer and hard drive

23   which increased his base offense level by 11 levels.

24   The defendant is not subject to unwarranted sentencing

25   disparities as compared to similarly-situated defendants

1   due to this expanded relevant conduct.

2          Finally, the Court considers the need to

3   provide restitution for victims of the offense.  Here,

4   restitution is due and owing to one victim, Henley, in

5   the amount of $3,000.

6          As discussed, however, Henley was far from

7   Mr. Watson's only victim.  The Presentence Report notes

8   four additional victims that Mr. Watson directly

9   threatened, extorted, and victimized, and he further

03:44PM 10  victimized still other victims through possessing and

11  distributing images of child pornography.

12         Before I impose the sentence on the record, are

13  there any objections?

14         Ms. Kolman, from the United States?

15         MS. KOLMAN:  No objections.

16         THE COURT:  Mr. Sharp, on behalf of Mr. Watson?

17         MR. SHARP:  No objection, Your Honor.

18         THE COURT:  The Court has considered the nature

19  and circumstances of the offense, the history and

03:45PM 20  characteristics of Mr. Watson, and the advisory

21  guidelines range, as well as the other factors listed in

22  18 United States Code § 3553(a).

23         Pursuant to the Sentencing Reform Act of 1984,

24  it is the judgment of the Court as to Count One and

25  Three of the Indictment that the defendant, Preston

Andrew Watson, is hereby committed to the Bureau of
Prisons for a term of imprisonment of 360 months.

This sentence consists of 360 months as to
Count One and 240 months as to Count Three to run
concurrently pursuant to Guideline Section 5G1.2.

This sentence is sufficient, but not greater
than necessary, to comply with the purposes of 18 United
States Code § 3553.

It is ordered that you forfeit your interest in
the property as outlined in the agreed preliminary order
of forfeiture filed with the court.

It is ordered that you shall make restitution
to the following victims in the following amounts:
$3,000 to Henley of the BluePillow1 series.  The
restitution shall be paid in full immediately.  The
government may enforce the full amount of restitution
ordered at any time pursuant to 18 United States Code §§
3612, 3613, and 3664(m).

The United States Bureau of Prisons, the United
States Probation Office, and the United States
Attorney's Office shall monitor the payment of
restitution and reassess and report to the Court any
material change in your ability to pay.  You shall make
restitution payments from any wages you may earn in
prison in accordance with the Bureau of Prisons Inmate

Financial Responsibility Program. Any portion of the
restitution that is not paid in full at the time of your
release from imprisonment shall become a condition of
your supervision.

The Court finds that you do not have the
ability to pay interest on the restitution ordered;
therefore, interest is waived.

The Court recommends that you receive 500 hours
of substance abuse treatment from the Bureau of Prisons'
Institution Residential Drug Abuse Treatment Program.

The Court recommends that you receive a mental
health evaluation and treatment while in the Bureau of
Prisons.

Upon release from imprisonment, you shall be
placed on supervised release for a term of 20 years as
to each of Count One and Three to be served
concurrently.

While on supervised release, you must not
commit another federal, state, or local crime. You must
not unlawfully possess and must refrain from use of a
controlled substance. You must comply with the standard
conditions that have been adopted by this court in Local
Rule 83.10. In particular, you must not own, possess,
or have access to a firearm, ammunition, destructive
device, or a dangerous weapon.

1    You must cooperate in the collection of DNA as

2  directed by your probation officer.  In addition, you

3  shall comply with the following special conditions:  You

4  shall comply with the special conditions for sex

5  offenders as adopted by this court in Standing Order

6  15-06.  Specifically, you shall comply with the

7  following conditions:  Standing Order 15-06(1), Standing

8  Order 15-06(2), Standing Order 15-06(3), Standing Order

9  15-06(4), Standing Order 15-06(5), Standing Order

03:48PM 10  15-06(6), Standing Order 15-06(8), Standing Order

11  15-06(9), Standing Order 15-06(10), Standing Order

12  15-06(11), Standing Order 15-06(12), and Standing Order

13  15-06(13).

14    You shall register with the state Sex Offender

15  Registry in any state in which you reside, are employed,

16  or are a student in compliance with the state Sex

17  Offender Registry.  You shall pay any financial penalty

18  that is imposed by this judgment and that remains unpaid

19  at the commencement of the term of supervised release.

03:49PM 20    You shall provide your probation officer with

21  access to any requested financial information.

22    You shall not incur new credit charges on

23  existing accounts or apply for additional lines of

24  credit without permission of the probation officer until

25  the restitution in this case has been paid in full.

1          In addition, you shall not enter into any

2     contractual agreements which obligate funds without the

3     permission of your probation officer.

4          You shall participate in a program of testing

5     and/or treatment for drugs and/or alcohol abuse as

6     directed by your probation officer until such time as

7     you're released from the program by your probation

8     officer.

9          You shall participate in a program of mental

03:50PM 10  health treatment as directed by your probation officer

11    until such time as you are released from the program by

12    your probation officer.

13         You shall waive all rights to confidentiality

14    regarding mental health treatment in order to allow

15    release of information to the supervising probation

16    officer and to authorize open communication between the

17    probation officer and the mental health treatment

18    provider.

19         You shall take all medication prescribed by the

03:50PM 20  treatment program as directed.  If deemed appropriate by

21    the treatment provider or your probation officer, you

22    shall submit to quarterly blood tests to determine

23    whether you are taking your medication as prescribed.

24         You shall submit your person, property, house,

25    residence, office, vehicle, papers, computers, other

electronic communications or data storage devices, or

media, to a search conducted by a United States

probation officer or his or her designee.  Failure to

submit to a search may be grounds for revocation of

release.  You shall warn any other occupants that the

premises may be subject to searches pursuant to this

condition.

        An officer may conduct a search pursuant to

this condition only when reasonable suspicion exists

that you have violated a condition of supervision and

the areas to be searched contain evidence of this

violation.  Any search must be conducted at a reasonable

time and in a reasonable manner.

        18 United States Code §§ 3565(b) and 3583(g)

require mandatory revocation of probation or supervised

release for possession of a controlled substance,

ammunition, or a firearm, or for refusal to comply with

drug testing.

        Pursuant to 18 United States Code § 3013, you

must pay a special assessment fee in the amount of $200

which shall be due immediately.

        The Court finds that you do not have the

ability to pay a fine; therefore, the Court will waive

the fine in this case.

        It is further ordered that you be remanded to

the custody of the Attorney General pending designation

by the Bureau of Prisons.

Pursuant to *United States versus Bostic*,

Ms. Kolman, does the government have any objection to

the sentence just pronounced that has not previously

been raised?

MS. KOLMAN:  No, Your Honor.  Thank you.

THE COURT:  Thank you.

Mr. Sharp, does the defendant have any

objections to the sentence just pronounced that has not

previously been raised?

MR. SHARP:  No objection, Your Honor.

THE COURT:  Mr. Watson, you have the right to

appeal your conviction and the right to appeal your

sentence.  Your plea agreement waives some of those

rights, but because you may wish to file an appeal to

challenge the waiver of your appeal rights, or to appeal

an issue not waived by your plea agreement, I will

advise you as to how you would pursue an appeal.

Any Notice of Appeal must be filed within

14 days of the entry of judgment or within 14 days of

the filing of a Notice of Appeal by the United States.

If requested, the Clerk of Court will prepare and file a

Notice of Appeal on your behalf.

If you cannot afford to pay the cost of an

appeal or appellate counsel, you have the right to

appeal -- apply for leave to appeal in forma pauperis,

which means you can apply to have the court waive the

filing fee in your case.  On appeal, you may also apply

for court-appointed counsel.

Mr. Watson, I hope that you will take full

advantage of the substance abuse and mental health

services provided by the Bureau of Prisons.  These

services can help speed your recovery and change

dangerous behaviors.

Are there other matters to resolve in this case

at this time?

Ms. Kolman?

MS. KOLMAN:  No, Your Honor, I don't believe

so.

THE COURT:  Mr. Sharp?

MR. SHARP:  Your Honor, would the Court

consider a recommendation to the BOP in Butner, North

Carolina or Lexington, Kentucky?

THE COURT:  Mr. Sharp, just to make sure I've

got that right, we're looking at a proposed

recommendation to Butner, North Carolina or FMC

Lexington?

MR. SHARP:  Correct, Your Honor.

THE COURT:  Ms. Kolman, I will presume the

1    United States would have no objection to that

2    recommendation.

3          MS. KOLMAN:  No objection.

4          THE COURT:  Okay.  The Court will make that

5    recommendation.

6          MR. SHARP:  Thank you, Your Honor.

7          Nothing further.  Thank you.

8          THE COURT:  With that, court is adjourned.

9          THE COURTROOM DEPUTY:  All rise.  This

03:54PM   10    honorable court stands adjourned.

11          (Which were all the proceedings had and

12           herein transcribed.)

13                 * * * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T-E

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4            I, Teresa S. Grandchamp, RMR, CRR, do hereby

5    certify that I reported in machine shorthand the above

6    proceedings; that the foregoing pages were transcribed

7    under my personal supervision and constitute a true and

8    accurate record of the proceedings.

9            I further certify that I am not an attorney or

10   counsel of any of the parties, nor an employee or

11   relative of any attorney or counsel connected with the

12   action, nor financially interested in the action.

13           Transcript completed and signed on Monday,

14   August 9, 2021.

15

16

17

18

20   _____
     TERESA S. GRANDCHAMP, RMR, CRR
21   Official Court Reporter

22

23

24

25